IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

NOVEMBER 1998 SESSION



**FILED**

**April 14, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | C.C.A. No. 03C01-9803-CR-00119 |
| Appellee, | ) | |
| | ) | Hamilton County |
| v. | ) | |
| | ) | Honorable Stephen M. Bevil, Judge |
| SHARON MARIE SHELL, | ) | |
| | ) | (Voluntary Manslaughter) |
| Appellant. | ) | |

FOR THE APPELLANT:

Leonard M. Caputo
312 Vine Street
Chattanooga, TN 37403

FOR THE APPELLEE:

John Knox Walkup
Attorney General & Reporter
425 Fifth Avenue, North
Nashville, TN 37243-0493

R. Stephen Jobe
Assistant Attorney General
425 Fifth Avenue, North
Nashville, TN 37243-0493

William H. Cox, III
District Attorney General
600 Market Street, Suite 310
Chattanooga, TN 37402

Barry A. Steelman
Assistant District Attorney General
600 Market Street, Suite 310
Chattanooga, TN 37402

OPINION FILED: _____

AFFIRMED

L. T. LAFFERTY, SENIOR JUDGE

# O P I N I O N

The appellant, Sharon Marie Shell, referred herein as "the defendant," appeals as of right pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure. Upon her plea of guilty to voluntary manslaughter, the trial court imposed a sentence of three years in the Department of Correction, denying an alternative sentence and full probation at the conclusion of the sentencing hearing.

The sole issue for appellate review is: whether the trial court erred in denying the defendant an alternative sentence in the form of probation or split confinement.

After a review of the entire record, the briefs of the parties, and applicable law, we AFFIRM the trial court's judgment.

## FACTUAL BACKGROUND

On March 27, 1996, the Hamilton County grand jury indicted the defendant for murder first degree in the killing of her fiancé, Charles Popp, on December 6, 1995. The victim died from a gunshot wound to the chest which penetrated the heart. On January 14, 1997, the defendant entered a guilty plea to voluntary manslaughter and requested that the trial court determine the appropriate sentence. The defendant also requested alternative sentencing of split confinement or full probation. A presentence report was prepared and, at the conclusion of a sentencing hearing on June 4, 1997, the trial court imposed a three-year sentence and ordered the defendant confined in the Department of Correction.

## SENTENCING HEARING

Detective Gary Gaskill, of the Hamilton County Sheriff's Department, testified he responded to a 911 call made by the defendant from her home in a trailer park on December 6, 1995. Upon arrival, Detective Gaskill met the defendant and her daughter,

2

Brandy Shell. Detective Gaskill observed the victim's body lying in the hallway of the trailer. The defendant appeared calm, but somewhat distraught. The defendant's initial statement was that the victim been beating her. Detective Gaskill had photographs taken of the defendant's face and arms, as well as those of Brandy Shell. There was no evidence of visible trauma. At his office, Detective Gaskill obtained tape recordings from both the defendant and her daughter.

In the pertinent parts of her statement, the defendant related that in May, 1995, she and the victim had been drinking and became involved in a heated argument. The victim beat her and blackened her eye, which required medical treatment. Since that incident, the victim made an effort to control himself, but the couple continued to have arguments. On the day of the offense, the defendant and victim began drinking at 12:00 noon and continued drinking upon their arrival at a tavern at 3:00 p.m., where the victim discussed business with an acquaintance. After consuming seven or eight beers each, they left the tavern around 6:00 p.m.

At 7:00 p.m., the defendant, the victim, the victim's brother, Houston Scudgins, and Brandy Shell went to Cancun's, a Mexican restaurant. While eating, the victim and his brother began teasing the defendant about Swedish women. In response, the defendant placed an empty bowl that had contained avocado dip on the victim's shirt front. The victim got mad and attempted to pour half of a pitcher of margaritas on the defendant. The defendant spilled some when she knocked the pitcher away. At home, the victim started slapping the defendant and told her, "You need to get out of here." Brandy screamed, and the victim began yelling at her and went in her room, acting as if he was going to hit her. The defendant retrieved a gun from a desk drawer in the living room, turned, and said, "That's enough." The victim was at Brandy's bedroom door. The defendant then shot the victim, but stated she did not mean to shoot him. She then called 911 for help.

Based on the defendant's statement, Detective Gaskill estimated the distance between the defendant and the victim to be twelve to fifteen feet at the time of the

3

shooting. The desk was located next to the front door of the trailer. During cross-examination, Detective Gaskill testified that the physical evidence contradicted the defendant's statement of where she was standing when the shot was fired. The desk was situated diagonally across the living room from the hallway entrance where the body was found. The medical report indicated the defendant and victim were within two to three feet of each other at the time of the shooting, which indicated to Detective Gaskill the defendant was going toward the victim. Detective Gaskill testified that the defendant, when she obtained the gun, had ample time to leave the trailer.

Houston Scudgins, brother of the victim, testified he and his brother were sub-framing contractors working at various job sites. The defendant and his brother bought a computer for the business, as the defendant kept the books. Scudgins described all three as heavy drinkers, but not during working hours. On the night of the offense, Scudgins testified he went to Cancun's with the defendant, the victim, and Brandy. Scudgins described the circumstances surrounding the avocado dip on the victim's shirt and the spilling of the margaritas. Later that evening, Scudgins heard about the shooting, but could not believe it, as the defendant and the victim appeared calm when he left them.

Evonne Burrows, a friend of the victim, testified in May, 1995, she, her husband, Billy Burrows, the victim, and the defendant had dinner together. The witness observed the defendant had a black eye. In discussing an unrelated murder, where a wife had killed her husband, Mrs. Burrow quoted the defendant, "Well, if you plan it right and say the right things at the right time anybody can get away with murder." The defendant said her ex-husband had taught her how to shoot, and she was a good shot, commenting further, "I could shoot Charlie [the victim] tomorrow and I wouldn't spend a day for it." At the time the defendant made these statements, Mrs. Burrows did not take them seriously.

Billy Burrows testified he was a longtime friend of the victim. During the dinner described by his wife, Evonne Burrows, Burrows asked the defendant, "Well, can you hit what you shoot?" The defendant responded, "Well, I hit can what I shoot, and more than

4

that, I'm not going to shoot nobody unless I'm killing them. . . . I'm not giving nobody a chance to get well and come back and get me."

Paula Hargis, the victim's sister, testified as to the effect her brother's death had on herself and the family. The witness believed the shooting was uncalled for.

Myrna Scudgins, the victim's mother, testified she had known the defendant since her son and the defendant were in junior high school together. Mrs. Scudgins believed she and the defendant had a good relationship, and on occasions, the defendant would take her to the doctor. Mrs. Scudgins testified that her son and Brandy Shell had a good relationship. Mrs. Scudgins testified she does not have a life any more and has to go out of her way to work to avoid passing the cemetery where her son is buried.

Chris Chambers, Director for the Domestic Violence Division of the Sheriff's Department, testified as to the number of domestic violence homicides occurring in Hamilton County since 1994. Chambers's unit came into existence in October, 1995. In 1994, in Hamilton County thirty-five percent of all homicides in Hamilton County were a result of domestic violence. In 1995, the ratio was again thirty-five percent. In 1996, the ratio was running twenty-five to twenty-seven percent. Detective Chambers testified there is a need to deter domestic violence in Hamilton County due to the growing number of those type of cases. Detective Chambers did not investigate this particular homicide. Also, Detective Chambers agreed domestic violence is not reported in a large number of cases for various reasons.

Kathy Lewis, the defendant's sister, testified the defendant called her after the incident in May, 1995. Mrs. Lewis and her husband took the defendant to the hospital. Mrs. Lewis described her sister's body as having marks all over it. Mrs. Lewis testified her sister was devastated over killing the victim. Since the incident, the defendant has enrolled in school to become a medical assistant. Mrs. Lewis denied her sister had a drinking problem or a temper, but admitted her sister had a previous DUI case in Catoosa County,

Georgia.

Rebecca Graybill, another sister of the defendant, testified the defendant came to her home every morning after her release from jail. Her sister would cry, pull her hair out, and begin screaming uncontrollably. Her sister kept saying, "I didn't mean to do it. I loved him."

Brandy Shell testified at the time of the hearing she was 15 years old. Brandy verified the truthfulness of her statement to Detective Gaskill. At the time of the May incident, Brandy was in North Carolina with her father, and her mother never talked to her about the event. Brandy testified the victim became enraged after the avocado incident at Cancun's. Brandy heard the victim slap her mother while in their bedroom. Brandy went to the bedroom and observed the victim strike her mother. She admonished the victim not to hit her mother. Brandy returned to her room, and the victim came in with his fist raised as if to strike her, so she fell on the bed and covered her face. In the meantime, her mother went to the living room. Brandy could not see her mother, but saw the victim being shot and falling at her bedroom door. After release from jail, her mother was distraught over this event and cried often. Although the victim spanked her one time, Brandy testified she had a good relationship with the victim.

At the time of the hearing, the defendant was living in Walker County, Georgia, and attending school to become a medical assistant. The defendant needed nine more months to complete a fifteen-month course. As to the May incident, the defendant testified it began at a friend's house, where she and the victim had stopped to allow their overheated truck to cool down. When the victim refused to leave, the defendant began walking home. The victim followed her, grabbed her by the hair, struck her, and forced her into the truck. At their home, the victim continued to hit and choke the defendant. She was able to get outside, but the victim drug her back inside and continued to abuse her. After the victim fell asleep, the defendant was able to call her sister and obtain medical treatment. She returned to live with the victim.

On the night of the offense, the defendant described the victim's mood as being similar to the May incident. Upon arriving home from the restaurant, the victim slapped the defendant four or five times in their bedroom. She heard Brandy yell, "Don't you hit my Mom." The victim was extremely angry and proceeded to Brandy's room. The defendant could not leave the trailer, because she did not want to leave Brandy alone with the victim for fear he would hurt her. The defendant denied making any statements to the Burrows about shooting a gun. The defendant was arrested in Georgia in March, 1996, for DUI, and was ultimately convicted.

During cross-examination, the defendant insisted she meant no harm to the victim, and that the gun just went off. When the defendant pulled the gun, she believed it would shock the victim, and he would stop and let her and Brandy go. However, the defendant recalled reaching into the desk drawer and turning when the gun fired. The defendant testified she was scared and fearful as to what the victim would do to her daughter. She also testified that the victim had pinned her on the floor during one incident in the past and had put a gun to her head.

It was stipulated by both parties that an official report submitted by the Georgia Bureau of Investigation, Division of Forensic Sciences, verified that the .357 caliber pistol used by the defendant took a force of approximately five pounds to pull the trigger in single action and a force of approximately thirteen pounds to pull the trigger in double action.

## SENTENCING CONSIDERATIONS

The defendant contends she is entitled to a complete suspended sentence or, in the alternative, to an alternative sentence including split confinement. The state counters the trial court was correct in determining that confinement was necessary to avoid depreciating the seriousness of the offense and to provide an effective deterrence to others.

When a defendant complains of the imposition of his or her sentence, we must conduct a **de novo** review with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d). Therefore, the burden of showing that the sentence is improper is upon the appealing party. Id. The presumption that determinations made by the trial court are correct is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Ashby,* 823 S.W.2d 166, 169 (Tenn. 1991); *State v. Smith,* 898 S.W.2d 742, 745 (Tenn. Crim. App. 1994), *per. app. denied* (Tenn. 1995).

If appellate review reflects the trial court properly considered all relevant facts and its findings of fact are adequately supported by the record, this Court must affirm the sentence "even if we would have preferred a different result." *State v. Fletcher,* 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In arriving at the proper determination of an appropriate sentence, the trial court must consider: (1) the evidence, if any, received at the guilty plea and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statements the defendant wishes to make in the defendant's behalf about the sentencing; and (7) the potential for rehabilitation and treatment. Tenn. Code Ann. §§ 40-35-102, -103, and -210; *State v. Holland,* 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993).

The defendant contends the record does not affirmatively show the trial court

considered the sentencing principles and all relevant facts and circumstances, thus this Court's review should be **de novo** without a presumption of correctness. *State v. Ashby,* 823 S.W.2d at 169. However, we believe the record establishes the trial court did consider the sentencing principles of the Tennessee Criminal Sentencing Reform Act of 1989, thus our review is with a presumption of correctness.

## Part A
### Denial of Alternative Sentence

The defendant contends that the trial court should have imposed an alternative sentence pursuant to Tenn. Code Ann. § 40-35-102(b) and § 40-35-303(b). Thus, we must determine whether the defendant is entitled to the statutory presumption that she is a favorable candidate for such sentencing. *State v. Bingham,* 910 S.W.2d 448, 453 (Tenn. Crim. App.), *per. app. denied* (Tenn. 1995); *State v. Bonestel,* 871 S.W.2d 163, 167 (Tenn. Crim. App. 1993). To meet this statutory presumption of alternative sentencing, the defendant must satisfy three requirements: (1) the defendant is an especially mitigated offender or standard offender; (2) the defendant must be convicted of a Class C, D, or E felony, Tenn. Code Ann. § 40-35-102(6); and (3) the defendant must not fall within the parameters of Tenn. Code Ann. § 40-35-102(5). Thus, the defendant cannot have a criminal history indicating either "clear disregard for the laws and morals of society" or "failure of past efforts at rehabilitation." *Bingham*, 910 S.W.2d at 454 (quoting Tenn. Code Ann. § 40-35-102(5)). Since the defendant pled guilty to voluntary manslaughter and is a first time standard offender, she is entitled to the presumption.

However, this presumption of entitlement to an alternative sentence may be rebutted by "evidence to the contrary." Tenn. Code Ann. § 40-35-102(6) (1994 Supp.). The sentencing considerations in Tenn. Code Ann. § 40-35-103 are of assistance in determining if the presumption is still viable:

> (1) Sentences involving confinement should be based on
> the following considerations:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

In this case, the trial court specifically found that any sentence other than confinement would depreciate the seriousness of the offense, and that confinement would provide an effective deterrent to others likely to commit similar offenses. Tenn. Code Ann. § 40-35-103(B).

In denying an alternative sentence based on the seriousness of the offense, "the circumstances of the offense as committed must be especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree," and the nature of the offense must outweigh all of the factors that favor a sentence other than confinement. *State v. Hartley,* 818 S.W.2d 370, 374-75 (Tenn. Crim. App. 1991); *State v. Travis,* 622 S.W.2d 529, 534 (Tenn. 1981).

In denying an alternative sentence, the trial court commented on the defendant's lifestyle before and after the offense. In its ruling, the trial court stated:

> There's been proof and this Court has considered the proof of the May incident. Now, as far as what really happened on that occasion we've heard different versions. We do know that she was beaten on that occasion and we do know that she went to the hospital. But we also know that after that incident happened she stayed with him and continued to be with him, continued to live in that relationship with him, even having her daughter come and live with them which indicates to me there was no fear on her part of Charlie Popp.
>
> * * * * *
>
> I don't think she was in fear of him. I don't think a person who is in fear of being beaten severely would pick up a bowl of avocado dip or guacamole dip and pour it on somebody who she's afraid of being beaten.

10

Ms. Shell appears to me, although not today, but based on the facts that are presented to be a very fiery hot-tempered person and could hold her own especially when she's been drinking or she wouldn't have poured that avocado dip on Charlie Popp or she wouldn't have tried to knock away the margaritas when he was pouring them on her. But there's a little bit of fault I think on both parties.

What the Court has to look at, too, is at the time this incident happened was she justified in taking his life? She's pled guilty to voluntary manslaughter which is admitting that she killed him in the heat of passion.

I'm concerned about the fact that I think she had alternatives available to her. She could have left the trailer. She said, well, I was afraid for Brandy. She knew where the gun was. She could have come back in the trailer. She could have gotten the gun if he had stayed there and if he had done something to Brandy. She did not have to stay there for that.

At the time she said she was afraid for Brandy. Brandy's own testimony was he said, "You better go to bed." And she said, "I'm in bed and he turned and walked away." There was no threat. There was no threat to Brandy. There was no fear at all to Brandy at the time and as soon as he turned before he had a chance to take much of a step she shot him and killed him.

\* \* \* \* \*

I think to not require Ms. Shell to be confined would be depreciating the seriousness of this offense. It would mean that Mr. Popp's life wasn't worth much. And I think it would be telling a message to Brandy to say, Brandy, if a guy beats up on you it is okay to live with him because if he gets too bad you can just pull out a gun and kill him and you can walk away. Again, I'm not condoning domestic violence. I detest it. I think there is no reason in the world for it. But I think it would be sending a wrong message to the community. I think it will be sending a wrong message to Brandy. I think it will be sending the wrong message to anyone else who is in a similar situation to stay if you choose.

The trial court was very concerned about the defendant's arrest for DUI while on bail release and her lack of respect for the law. Likewise, it is obvious from the record that the trial court was very concerned about the facts surrounding the victim's death.

We cannot say that the facts in this record met all the standards set forth in *Hartley,* 818 S.W.2d at 374-75. However, in arriving at a proper sentence and its imposition, the trial court is entitled to inquire into the nature and characteristics of the criminal conduct involved. Tenn. Code Ann. § 40-35-210(b)(4); *State v. Hollingsworth,* 647 S.W.2d 937,

11

939 (Tenn. 1983). The state argues that exceptional circumstances must be shown by the defendant in order to support probation or an alternative sentence in cases involving the death of another person. This issue has been addressed in a number of appellate cases. However persuasive this argument may be, the existence of the death of a person in and of itself cannot constitute sufficient "evidence to the contrary" under Tenn. Code Ann. § 40-35-102(6); *Hartley,* 818 S.W.2d at 374; *Bingham,* 910 S.W.2d at 455; *State v. Bradley Joe Housewright,* No. 03C01-9705-CR-00195, 1997 WL 785672 (Tenn. Crim. App., Knoxville, December 16, 1997), *per. app. denied* (Tenn. 1998).

From our analysis of the evidence in this record, we concur in the trial court's finding that the death of the victim was needless and unnecessary. We believe the death of the victim was violent, offensive, and excessive under these facts. Therefore, the nature of these facts outweighs all factors favoring a sentence other than confinement. As part of the denial of an alternative sentence, the trial court was concerned with deterrence. Before a trial court can deny an alternative sentence on the ground of deterrence, there must be some evidence contained in the record that the sentence imposed will have a deterrent effect within the jurisdiction. *State v. Bonestel,* 871 S.W.2d 163, 170 (Tenn. Crim. App. 1993). This Court has repeatedly held that the finding there will be a deterrent effect within the jurisdiction cannot be merely conclusory but must be supported by proof. *State v. Ashby,* 823 S.W.2d at 170.

In support of deterrence in domestic violence offenses in Hamilton County, the state offered proof from the Director of the Domestic Violence Unit. It was established that thirty-five percent of all homicides committed in Hamilton County from 1994 to 1996 were a result of domestic violence. The trial court commented that much emphasis is placed on drinking and driving, but little thought is given to drinking and guns, which was the case here. Guns and drinking play a substantial part in domestic violence offenses. We believe it was proper for the trial court to consider such factors in determining whether deterrence was applicable. There is no merit to this issue.

**Part B**

**Full Probation**

The defendant contends that she is entitled to full probation. Therefore, the defendant has the burden of establishing she is suitable for full probation, even if the defendant is entitled to the statutory presumption of an alternative sentence. Tenn. Code Ann. § 40-35-303(b); *State v. Grissom,* 956 S.W.2d 514, 520 (Tenn. Crim. App. 1997); *State v. Bingham,* 910 S.W.2d 448, 455 (Tenn. Crim. App.), *per. app. denied* (Tenn. 1995). In doing so, the defendant must demonstrate that probation will "subserve the ends of justice and the best interests of both the public and the defendant." *State v. Dykes,* 803 S.W.2d 250, 259 (Tenn. Crim. App.), *per. app. denied* (Tenn. 1990) (quoting *Hooper v. State*, 201 Tenn. 156, 162, 297 S.W.2d 78, 81 (1956)).

When determining suitability for probation, the sentencing court considers the following factors: (1) the nature and circumstances of the criminal conduct involved; (2) the defendant's potential or lack of potential for rehabilitation, including the risk that during the period of probation, the defendant will commit another crime; (3) whether the sentence of full probation would unduly depreciate the seriousness of the offense; and (4) whether a sentence other than full probation would provide an effective deterrent to others likely to commit similar crimes. Tenn. Code Ann. §§ 40-35-210(b)(4), -103(5), 103(1)(B) (1990); *Bingham,* 910 S.W.2d at 456.

In considering probation, the trial court may inquire into the facts and circumstances surrounding the criminal conduct. Denial of probation may be based solely upon the circumstances of the offense when they outweigh all other factors favoring probation. *State v. Fletcher,* 805 S.W.2d 785, 788-89 (Tenn. Crim. App. 1991). The comments made by the trial court in denying an alternative sentence are applicable to the request for full probation. We concur in the trial court's findings. Upon **de novo** review and in accord with a presumption of correctness, we are unable to conclude that the trial court erred in determining the defendant had not met her burden of establishing suitability for full

13

probation.

The judgment of the trial court is affirmed.

_____

L. T. LAFFERTY, SENIOR JUDGE

CONCUR:


_____

DAVID H. WELLES, JUDGE


_____

JAMES CURWOOD WITT, JR., JUDGE